# EXHIBIT 1

Case: 1:23-cv-01978 Document #: 1-1 Filed: 03/29/23 Page 2 of 53 PageID #:4

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION

FILED
2/8/2023 11:38 AM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2023L001306
Calendar, W
21382937

LUNA CAPITAL FUNDING, LLC, )
)
    Plaintiff, )    No. 2023L001306
)
    vs. )    Amount Claimed: $426,000.00 plus costs
)    and pre-judgment interest.
A&R DEVELOPMENT GROUP, LLC, )
an Alabama limited liability company )
d/b/a A&R Group, )
)
    Defendant. )

## COMPLAINT AT LAW

Plaintiff, Luna Capital Funding, LLC., for its Complaint at Law against Defendant, A&R

Development Group, LLC, d/b/a A&R Group, states and alleges as follows:

### COUNT I
### *(Breach of Contract)*

1.    Luna Capital Funding, LLC ("Luna") is a limited liability company organized and

existing under the laws of the State of Illinois engaged in the business of procuring commercial

financing and loans for its clients.

2.    Upon information and belief, Defendant is a limited liability company organized

under the laws of the State of Alabama named A&R Development Group, LLC and doing business

under the assumed name of A&R Group ("A&R").

3.    On or about January 11, 2021, A&R and Luna signed a document entitled "Loan

Placement Agreement" (the "LPA"), a true and correct copy of which is attached hereto as **Exhibit**

**A**.

FILED DATE: 2/8/2023 11:38 AM    2023L0001306

4.      Section 1 of the LPA provides, in part, that A&R "hereby retains [Luna] as its commercial finance broker/lender and grants [Luna] the right to solicit, negotiate and obtain financing on behalf of [A&R] in accordance with the terms of this [LPA]." (Exhibit A, p. 1)

5.      Section 3 of the LPA provides, in part, that Luna "is retained to solicit, negotiate, and obtain financing on the following terms or upon such terms as may be accepted by Applicant or contained in any loan application, Good Faith Estimate, loan document, letter of interest, term sheet, commitment letter or closing statement signed by [A&R]." (Exhibit A, p. 1)

6.      Section 6 of the LPA provides, in part:

"[A&R] agrees to pay [Luna] a fee for its services provided to [A&R]. The amount of the fee(s) will be calculated based upon the amount of the financing a lender commits to provide to [A&R] or is approved by lender, or upon the amount funded by a lender, and if no commitment or approval for financing or funding is obtained and a fee is payable … then the amount of the fee will be calculated and based upon the high end of the loan amount as set out in Paragraph 3 above (Points to [Luna]), but not less than fifty basis point or one half of a percent (0.50%) or the fee specified in any loan application. (Exhibit A, p. 1)

7.      Section 7 of the LPA provides, in part, that:

**DATE WHEN FEE IS EARNED AND PAYABLE**: The fee is irrevocably earned and immediately payable to [Luna] upon the earliest of the following events:

\*\*\*

(b)     The date of issuance, by any lender, of an approval letter or commitment letter, including, but not limited to: future funding, standby, forward or takeout approvals or commitments.

\*\*\*

(d)     The first date of any act by [A&R] which prohibits, prevents, or otherwise interferes with the performance of [Luna's] services hereunder. The parties hereby acknowledge and agree that [A&R's] refusal to provide documentation when requested or any attempt by [A&R] to unilaterally terminate or modify this ELPA, or [A&R's] refusal to consummate the financing prohibits, prevents or interferes with the performance of [Luna's] services and thus, in addition to extending the term pursuant to Paragraph 5, above, constitutes a breach of this [LPA] by [A&R]. (Exhibit A, p. 1)

FILED DATE: 2/8/2023 11:38 AM   2023LA001306

8.      Section 9 of the LPA provides, in part, "This [LPA] shall be governed by and construed in accordance with the laws of the State of Illinois. Venue for any Court action to enforce this [LPA] shall be in the Superior [*sic*] Court of Illinois for Cook County… The prevailing party in any litigation or mediation shall recover its costs and attorney fees, including any contingent attorney fees, from the other party." (Exhibit A, p. 2)

9.      After A&R and Luna signed the LPA, Luna solicited, negotiated and obtained financing for A&R to be provided by Summit Financial and Investment Group, LLC ("Summit").

10.     On January 10, 2022, Summit sent A&R a proposed letter of intent containing the terms of its financing for A&R.

11.     On January 31, 2022, A&R, through its representative, David Wallace ("Wallace"), requested an extension from Summit of the LOI's expiration date of January, 31, 2022, to which Summit agreed.

12.     On February 2, 2022, Wallace delivered via email a copy of the letter of intent revised by A&R and Summit and signed by A&R on February 2, 2022 (the "LOI"), a true and correct copy of which is attached hereto as **Exhibit B**.

13.     Wallace stated in his February 2, 2022 email delivering the LOI to Summit:

As promised, attached please find the fully executed Letter of Intent. Thank you for granting us the additional time to ensure that everyone was on the same page and feeling comfortable with the various terms.

We look forward to moving to the next step and await your return of the Loan Commitment and the Exhibit containing the required deliverables. Once we get the required due diligence deliverable list, then we will set up a weekly status call to advance the project to a successful closing.

Looking forward to getting this project across the finish line.

FILED DATE: 2/8/2023 11:38 AM    2023L001306

14.    On February 4, 2022, Summit issued and delivered to Wallace for A&R a document entitled "Permanent Loan Conditional Commitment" (the "Loan Commitment," a true and correct copy of which is attached hereto as **Exhibit C**) and related documents.

15.    On February 10, 2022, the day before the expiration date of the Loan Commitment, A&R sent Summit an email stating, in part: "[u]nfortunately, we will not be able to meet the deadline for signatures on the loan commitment, thus resulting in us having to decline the offer as it is our understanding that if this deadline is not met that the deal will be taken off the table."

16.    Luna has performed all of its duties under the LPA.

17.    The LOI contained the terms of financing solicited, negotiated and obtained by Luna and was signed by A&R.

18.    The principal amount of the loan to be financed by Summit set forth in the LOI signed by A&R and in the Loan Commitment issued by Summit was $86,500,000.00. (Exhibit B, p. 2, Exhibit C, p. 3)

19.    The amount of Luna's fee under the LPA for its services rendered to A&R was 50 basis points (0.50% of the principal amount of the loan), or $426,000.00.

20.    A&R has not paid to Luna any of its $426,000.00 fee.

21.    Luna has made demands to A&R for payment of its fee and A&R has refused to pay any amount of that fee to Luna.

WHEREFORE, Plaintiff, Luna Capital Funding, LLC, prays that this Honorable Court enter judgment in its favor and against Defendant, A&R Group, LLC, in the amount of $426,000.00, plus its reasonable attorneys' fees costs incurred in bringing this action, pre-judgment interest and for any such other and further relief that this Honorable Court deems proper and just.

                                     Respectfully submitted,

                                     LUNA CAPITAL FUNDING, LLC

By:    /s/ William A. Castle, Jr.
          One of Its Attorneys

William A. Castle, Jr.
Robbins DiMonte Ltd.
*Attorneys for Luna Capital Funding, LLC*
180 N. LaSalle Street, Suite 3300
Chicago, Illinois 60601
(312) 782-9000
wcastle@robbinsdimonte.com
Firm no. 99688

FILED DATE: 2/8/2023 11:38 AM 2023L001306

# EXHIBIT A



# EXCLUSIVE LOAN PLACEMENT AGREEMENT

For the mutual exchange of good and valuable consideration, the adequacy of which is hereby acknowledged and agreed, this Exclusive Loan Placement Agreement ("ELPA") is entered into by and between the undersigned applicant(s) shown on the Signature Block attached hereto ("APPLICANT") and Luna Capital Funding, LLC ("COMPANY"). This ELPA is entered into as of the date the last party accepting this ELPA executes it ("Effective Date").

1.  **EXCLUSIVE AUTHORIZATION:** APPLICANT hereby retains COMPANY as its commercial finance broker/ lender and grants COMPANY the exclusive right to solicit, negotiate and obtain financing on behalf of APPLICANT in accordance with the terms of this ELPA. In exchange for payment of the Fee as set forth herein, as part of its obligations to APPLICANT, COMPANY will use its best efforts to solicit, negotiate and obtain financing on behalf of APPLICANT

2.  **PROPERTY:** The property which is the subject of this ELPA ("PROPERTY") is described as follows:

    | | |
    |---|---|
    | **Description:** | Hotel Refinance and Equity Cash-Out |
    | **Location:** | Gulf Shores Region, USA |
    | **Name:** | A&R Hospitality |

3.  **FINANCING:** COMPANY is retained to solicit, negotiate, and obtain financing on the following terms or upon such terms as may be accepted by APPLICANT or contained in any loan application, Good Faith Estimate, loan document, letter of interest, term sheet, commitment letter or closing statement signed by APPLICANT:

    | | |
    |---|---|
    | **Loan Amount:** | Approximately $118,000,000 |
    | **Term:** | 10 Years |
    | **Amortization:** | 25 Years |
    | **Rate:** | 6.25% to 8.00% |
    | **Loan Position:** | First Lien Position |
    | **Loan to Cost:** | LTV/LTC not to exceed 70% |
    | **Points:** | 0.50 Basis Points to COMPANY 1.00 Point to Lender. |
    | **Target Funding:** | Likely 90 days |
    | **Additional Financing:** | Applicant to pay Company 0.75 Basis Points for subsequent financing. |

    APPLICANT understands that a lender's commitment to provide financing to APPLICANT will often include terms in addition to those specified above or which are contained in any loan application, Good Faith Estimate, loan document, letter of interest, term sheet, commitment letter or closing statement signed by APPLICANT. APPLICANT further understands that the above shown rates are subject to change every day unless or until a rate lock agreement is executed or the lender's commitment is executed and the rate is locked. It is agreed that the material terms of the financing sought by APPLICANT are specified above or are specified in any loan application, Good Faith Estimate, loan document, letter of interest, term sheet, commitment letter or closing statement which modifies the above specified terms and is signed by APPLICANT; all other terms are deemed immaterial. APPLICANT shall reimburse COMPANY for any actual expenses (i.e. credit reports, travel expenses, courier fees, professional photos, etc.).

4.  **TERM:** COMPANY is exclusively retained by APPLICANT to solicit, negotiate and obtain financing for a period of time ("Term"). The Term of this ELPA shall begin on the Effective Date and, subject to Paragraph 5 below, shall extend through February 28, 2022. If, at the expiration of the Term of this ELPA, COMPANY is negotiating with a lender to obtain financing, or is in processing or underwriting but the lender has not provided the funds for the financing, then the Term of this ELPA shall be extended until the lender either provides or declines to provide the funds for the financing.

© 2021 Luna Capital Funding, LLC © ALL RIGHTS RESERVED.

5. **DOCUMENTS**: Promptly upon written request by COMPANY or a prospective lender, APPLICANT shall furnish, at APPLICANT's sole cost and expense, plans, specifications, rent rolls, cost breakdowns, operating statements, aerial photographs, surveys, tax returns, appraisals, environmental reports (current Phase I ESA), market studies, photo ID, a description of APPLICANT's development background and expertise, financial statements, title reports, rent comparables (comps), lease forms and other such documents or data as COMPANY or such lender may request. If APPLICANT fails to comply with any such request within three (3) days of APPLICANT's receipt of the written request, then, in addition to any other remedy COMPANY may have, the Term shall be automatically extended by the number of days between the date of the request and the date on which the requested documents are delivered to the requesting party.

6. **FEE**: APPLICANT agrees to pay to COMPANY, in United States Dollars, a fee for the services provided to APPLICANT. The amount of the fee(s) will be calculated based upon the amount of the financing a lender commits to provide to APPLICANT or is approved by lender, or upon the amount funded by a lender, and if no commitment or approval for financing or funding is obtained and a fee is payable, such as shown in paragraph 7(d) below (i.e. prohibition, prevention or interference by APPLICANT), then the amount of the fee will be calculated and based upon the high end of the loan amount as set out in Paragraph 3 above (Points to COMPANY), but not less than fifty basis point or one half of a percent (0.50%) or the fee specified in any loan application, Good Faith Estimate, loan document, letter of interest, term sheet, approval letter or commitment letter, whichever is greater; and if APPLICANT breaches this ELPA, all fees that could be earned by COMPANY on this ELPA, including any and all phases on multi-phase projects/PROPERTY (including but not limited to all construction loans, mini-perm loans, and permanent/takeout loans, etc. related to the PROPERTY), shall irrevocably become immediately due and payable. If COMPANY is able to negotiate lower Points to Lender than what is set out in Paragraph 3 above, then COMPANY will receive the difference in addition to the Points to COMPANY. The fees shall be payable regardless of whether COMPANY, APPLICANT or any other person or entity obtains the financing on behalf of APPLICANT. COMPANY may also receive lender rebates, yield service premiums or servicing fees. If COMPANY also acts as a lender or an investor then, in addition to the payment of the above fee to COMPANY, APPLICANT will pay to COMPANY the amount payable to Lender as set out in Paragraph 3 (Points to Lender) including any Extension Fees or Exit Fees.

7. **DATE WHEN FEE IS EARNED AND PAYABLE**: The fee is irrevocably earned and immediately payable to COMPANY upon the earliest of the following events:

   (a)   The date funding is made available to APPLICANT within the Term of this ELPA or any extension of the Term.
   (b)   The date of issuance, by any lender, of an approval letter or a commitment letter, including, but not limited to: future funding, standby, forward or takeout approvals or commitments.
   (c)   The date funding is made available to APPLICANT outside the Term of this ELPA but within one (1) year of the expiration of the Term by lender whose name appears on the ("Registration List Agreement") which COMPANY and APPLICANT shall sign prior to the release of any terms or engagement.
   (d)   The first date of any act by APPLICANT which prohibits, prevents, or otherwise interferes with the performance of COMPANY's services hereunder. The parties hereby acknowledge and agree that APPLICANT's refusal to provide documentation when requested or any attempt by APPLICANT to unilaterally terminate or modify this ELPA, or APPLICANT's refusal to consummate the financing prohibits, prevents and interferes with the performance of COMPANY's services and thus, in addition to extending the term pursuant to Paragraph 5, above, constitutes a breach of this ELPA by APPLICANT.

8. **ESCROW INSTRUCTIONS & FEE DISBURSEMENT**: APPLICANT hereby authorizes COMPANY to prepare and submit a Fee Demand (Broker Demand) to be sent to or filed with any such lender, escrow officer, title officer, attorney, court, county recorder's office, or any other party. This Paragraph shall serve as APPLICANT's irrevocable authorization and instruction to any lender, escrow officer, title officer, attorney, court, county recorder's office, or any other party involved in the transaction to:

   (a)   Pay and disburse the fees owed to COMPANY, as shown on the Fee Demand prepared and submitted by COMPANY, from the proceeds of any financing, or sale proceeds obtained by APPLICANT during the Term of this ELPA, obtained by APPLICANT during any extension of the Term of this

© 2021 Luna Capital Funding, LLC ® ALL RIGHTS RESERVED.

ELPA, during such continuing representation of this ELPA, or provided by a lender identified on the Registration List; and

**(b)** Not close any financing or sale without paying in full the COMPANY prepared and submitted Fee Demand.

9. **DISPUTE RESOLUTION:** COMPANY expects to be paid for professional and other services provided pursuant to this ELPA, and that if, pursuant to Paragraph 2 above, a fee has been earned and is payable, then COMPANY, at the sole discretion of COMPANY, has the irrevocable right to enforce its claim by final, binding mediation, or to file suit in any court of competent jurisdiction. This ELPA shall be governed by and construed in accordance with the laws of the State of Illinois. Venue for any Court action to enforce this ELPA shall be in the Superior Court of Illinois for Cook County. COMPANY in its sole discretion may, but is not required to, elect to proceed with binding mediation. If COMPANY elects binding mediation, any mediation hearings shall be held in a location to the COMPANY's discretion. The mediation service shall be: Judicial Arbitration & Mediation Service ("JAMS"), or Judicial Dispute Resolution ("JDR"), at COMPANY's sole election. All matters concerning Mediator selection, cost-sharing, pre-hearing civil discovery, evidence rules, hearing scheduling and the like shall be jointly determined by the rules and guidelines of the service selected jointly by APPLICANT and COMPANY. The prevailing party in any litigation or mediation shall recover its costs and attorney fees, including any contingent attorney fees, from the other party. The non- prevailing party in any litigation or mediation shall be responsible for payment the prevailing party, above and beyond the mediation award or judgment, for any additional costs, fees and expenses the prevailing party may incur in the collection of the award or judgment, including, but not limited to; attorney fees, contingent attorney fees, collection attorney fees including any hourly or contingent percentage fees, collection agency fees, bond fees, filing fees, etc.

10. **INTEREST**: If there is a failure to make any payment to COMPANY at the time required in this ELPA, the delinquent sum(s) shall bear interest from the date COMPANY's fees are due, at the rate of eighteen percent (18.00%) per year or the maximum interest rate for commercial contracts permitted by Illinois State law, whichever is lower.

11. **APPLICANT REPRESENTATIONS**: APPLICANT hereby warrants and represents to COMPANY that: (a) APPLICANT is the owner of record or the ground lessee of the PROPERTY or has the legal authority to execute this ELPA on behalf of such owner or lessee; (b) no person or entity or broker has any right to purchase the PROPERTY or to obtain financing for the PROPERTY or to acquire any interest therein by virtue of any agreement for sale, option, right of first refusal or other agreement; (c) there are no delinquencies or defaults under any deed of trust, mortgage, property taxes, state or federal taxes, or any other encumbrance on the PROPERTY; (d) the PROPERTY is not subject to the jurisdiction of any court in any bankruptcy, insolvency, conservatorship or probate proceeding; (e) neither COMPANY nor any person affiliated with COMPANY has made any promises or representations to or agreements with APPLICANT, not contained in this ELPA, which in any manner affect APPLICANT's or COMPANY's rights and obligations under this ELPA; (f) APPLICANT has disclosed all signed leases to COMPANY; and (g) APPLICANT has not leased to any persons or entities that conduct illegal activities under State or Federal laws.

© 202* Luna Capital Funding, LLC @ ALL RIGHTS RESERVED.

12. **CONFIDENTIALITY, OWNERSHIP, NON-DISCLOSURE, AND NON-CIRCUMVENTION:**

    **(a)** The parties hereto agree that all financial dealings between the parties shall be confidential in nature and that the negotiations, terms and conditions of this ELPA and any related documents and agreements are confidential and shall not be disclosed to any non-related parties unless required to collect COMPANY fees.

    **(b)** APPLICANT agrees that he shall not by himself or together with others, use or discuss, either directly or indirectly, any trade secrets or confidential information of COMPANY including, but not limited to, any information regarding COMPANY research information, computer software, computer systems, computer hardware, financial institutions/entities, and any information about the marketing concept or programs, hereinafter "Confidential Information." APPLICANT agrees to restrict circulation of all Confidential Information, and in no case will a disclosure be made without first advising the party receiving the Confidential Information of the existence of this ELPA and restrictions in this ELPA, and having said party agree in writing to be bound by the terms and conditions of this ELPA. Any and all Confidential Information (including all copies thereof) shall be returned to COMPANY immediately upon demand.

    **(c)** COMPANY may be introducing APPLICANT to specific financial institutions/entities or banks or investors or joint venture participants or other persons for the purpose of and not limited to formulating real estate financial arrangements or business. APPLICANT shall keep completely confidential the names of said financial institutions/entities, individuals, corporations, or other information pertaining to the Confidential Information and shall include, as Confidential Information, any telephone numbers, fax numbers, emails, website addresses, street addresses, mailing addresses, telex numbers et al. Such information is considered the property of COMPANY and shall not be disclosed to any person without the written and expressed permission of COMPANY.

    **(d)** The provisions of Paragraph 13 (a-d) of this ELPA constitute a perpetuating guarantee from the date affixed below and are to be applied to any and all transactions entertained by APPLICANT with regards to the aforementioned Confidential Information, including subsequent follow-up, repeat, extended or renegotiated transactions, as well as to the initial transaction, regardless of the success of the transaction. The provisions of Paragraph 13 (a-d) shall survive the termination or expiration of this ELPA.

13. **INDEMNIFICATION:** APPLICANT agrees to defend, indemnify, and hold harmless COMPANY and its owners, representatives, brokers, managers, successors, designees, and assigns from and against any and all claims, demands, liabilities and damages, arising from Paragraph 10 above, in the collection of fees from APPLICANT and from any incorrect, inaccurate or false information supplied by APPLICANT, or any material information which APPLICANT fails to supply.

14. **INURE & COUNSEL:** This ELPA shall inure to the benefit of and be binding upon COMPANY and APPLICANT and their respective successors, assigns, designees, and legal representatives. Where APPLICANT refers to more than one person or entity, each shall be jointly, severally, personally and individually liable and responsible to perform APPLICANT'S responsibilities under this ELPA. APPLICANT acknowledges receipt of a copy of this ELPA which APPLICANT represents and warrants that APPLICANT has read, fully understands its terms and provisions, has had an opportunity to review this ELPA with legal counsel, and has executed this ELPA based upon such party's own judgment or the advice of independent legal counsel.

15. **DIGITAL SIGNATURES, ELECTRONIC FACSIMILE, & EMAIL:** APPLICANT hereby agrees that agreements and live signatures or digital signatures (e.g., DocuSign) transmitted by electronic facsimile or email have the same legal effect as signatures on originals or copies and that digital signatures have the same legal effect as live/wet signatures.

16. **NOTICES:** All notices relating to this ELPA shall not be effective unless given to the parties at either the business address or one of the email addresses below specified. Such addresses shall remain in effect until either party notifies the other party in writing of a different address to be used for such notices:

    To COMPANY: Luna Capital Funding, LLC 3908 W Montrose Ave, Unit 2R, Chicago, IL 60618
    To APPLICANT: See APPLICANT's Business Mailing Address and Email Address below on Signature Block

17. **AMENDMENTS:** No amendments or modifications or termination of this ELPA shall be valid or binding unless made in writing and signed by a representative of COMPANY and by an officer or owner of APPLICANT.

18. **SEVERABILITY & WAIVER:** If any provision of this ELPA, or any portion thereof, is held to be invalid or unenforceable, then the remainder of this ELPA shall nevertheless remain in full force and effect. Waiver by one party hereto of a breach of any provision of this ELPA by the other shall not operate or be construed as a continuing waiver.

19. **CONSTRUCTION & INTERPRETATION:** The parties acknowledge that they have had the right and the opportunity to negotiate the language and terms of this ELPA. This ELPA will in all events be construed as a whole, according to its fair meaning, and not strictly for or against a party merely because that party, or that party's legal representative, drafted this ELPA. The headings, titles, and captions contained in this ELPA are merely for reference and do not define, limit, extend, or describe the scope of this ELPA or any provision in this ELPA. Unless the context requires otherwise, (a) the gender, or lack of gender, of all words used in this ELPA includes the masculine, feminine, and neuter, and (b) the word "including" means "including, without limitation."

The rest of this page intentionally left blank.

© 202' Lunk Capital Funding, LLC ® ALL RIGHTS RESERVED.

SIGNATURE BLOCK

ACCEPTED BY APPLICANT:

Company Name: A&R Group      Company Name: _____

By: _____      By: _____

Name: Zach Hoyt      Name: _____

Title: President of Development      Title: _____

Business Address: 1544 W 2nd St Gulf Shores, AL 36542
Emails: zach@anrgroup.com
Phones: _____
Phones: 251-979-5763

ACCEPTED BY COMPANY:

By: *Daniel Moone*

By: Daniel Moone, Managing Member

 ©2021 Ua'a Capital Funding, LLC® ALL RIGHTS RESERVED.

## CONTINUING REPRESENTATION AGREEMENT:

APPLICANT acknowledges that as a result of COMPANY's services hereunder, a relationship may be established with Summit Financial Investment Group by COMPANY on behalf of APPLICANT which may offer APPLICANT the opportunity to obtain other loans *from such financing entity*. APPLICANT agrees that COMPANY shall be the ~~exclusive~~ mortgage broker/lender to obtain financing, secured by any real or personal property, owned or controlled by APPLICANT, or by any affiliate or entity owned or controlled by, or owning or controlling APPLICANT *from such financing entity*. The term of said representation shall be twelve (12) months commencing as of the Effective Date. APPLICANT shall pay a fee to COMPANY equal to the percentage set forth in the "Loan Placement Agreement" or contained in any loan application, Good Faith Estimate, loan document, letter of interest, term sheet, commitment letter or closing statement signed by APPLICANT, whichever is greater. The fee shall be due and payable upon the initial funding of such additional financing whether such financing is obtained by COMPANY, by APPLICANT or by any other person or entity

SIGNATURE BLOCK

ACCEPTED BY APPLICANT:

Company Name: A&R Group

Company Name:

By:

By:

Name: Zach Hoyt

Name:

Title: President of Development

Title:

FILED DATE: 2/8/2023 11:38 AM   2023L001306

# EXHIBIT

# B

# SUMMIT FINANCIAL AND INVESTMENT GROUP, LLC

**10421 South Jordan Gateway ◆ Suite 600 ◆ South Jordan ◆ Utah 84095**
(801) 944-4320 Office ◆ (801) 944-4322 Fax ◆ Email: sfig@sfig.com
*Real Estate Investment Bankers*

Monday, January 10, 2022

Mr. Virendra Patel
A&R Group
1544 W. 2nd Street, Suite114
Gulf Shores, Alabama 36542

Re: **LETTER OF INTENT** – 10 Property Refinance and Cash Out

Dear Mr. Patel:

Summit Financial and Investment Group, LLC (SFIG) is pleased to issue this Letter of Intent (LOI) **to A&R Group, its Key Principals, Owners and Guarantors hereinafter collectively referred to as "Borrower"** on the terms and conditions set forth in this LOI to finance the property owned by the Borrower, referenced above, together with all of the parking and other appurtenant facilities upon certain land located **in Gulf Shores, AL and Pensacola, FL,** (Subject Property) and all of the personal property both tangible and intangible, now or hereafter, located thereon or used or intended to be used in connection therewith, for which proceeds are advanced on the terms and conditions set forth in this letter. This Letter of Intent is subject to the terms and conditions and general parameters set forth in this letter and the underwriting constraints contained herein.

This Letter of Intent precedes a Commitment for a Loan Secured by Real Estate and guaranteed by the Borrower. Acceptance and execution of this Letter of Intent from SFIG is not a commitment to make the Loan. While SFIG has prepared this Letter of Intent based on information provided by the Borrower, Borrower acknowledges that SFIG and/or its Investor(s) and/or Capital Partner(s), hereinafter "SFIG" will conduct a complete and thorough independent review of the underwriting and any additional information provided by Borrower and, accordingly, determines in its sole discretion; (a) whether it will commit to make the loan and (b) the final loan amount and terms thereof. The general loan parameters are as follows:

*This Letter of Intent shall expire at the close of business on* **MONDAY, JANUARY 31ST, 2022.**

*After this date this Letter of Intent shall be of no force or effect and all terms, rates and conditions will be withdrawn.*

*This is not a binding agreement and execution of this agreement by Borrower does not obligate the same.* **No Commitment Fee is due with the execution of this Letter of Intent.** *The Letter of Intent will be binding in conjunction with the acceptance and execution of the Loan Commitment and will then be known as Exhibit "B".*

Initials _____

## LOAN PARAMETERS:

**The following terms, conditions and structure are to be considered firm based on the information provided to date and on preliminary underwriting review and analysis and are subject to underwriting and financial reviews.**

**LETTER OF INTENT**
**EXPIRATION DATE:** This Letter of Intent shall expire at the close of business on **MONDAY, JANUARY 31ST, 2022** and shall be of no force or effect thereafter unless fully executed and received by SFIG; or arrangements have been made with SFIG for a reasonable extension.

**SUBJECT PROPERTY NAMES:**

| Company | Brand |
|---|---|
| Shivam Hospitality LLC | Beachside Resort |
| Gulf Shores Hospitality LLC | Holiday Inn Express by IHG |
| Radha Hospitality LLC | Motel 6 by M6 |
| Shree Kapil Hospitality LLC | Red Roof Inn |
| Shree Omkar Delaware LLC | Courtyard by Marriott |
| Aditi Hospitality LLC | Quality Inn by Choice |
| Maruti Hospitality LLC | Fairfield Inn by Marriott |
| Om Investment Group LLC | Microtel Inn by Wyndham |
| Kanah Hospitality LLC | Red Roof Inn |
| Shree Vikat Hospitality LLC | Staybridge Suites by IHG |

**PROPERTY ADDRESS:** Gulf Shores, AL, Pensacola, FL, Orange Beach, AL.

**PROPERTY TYPE:** Branded Hotels.

**OWNERS BORROWERS**
**BORROWER:** A&R Group, and its Key Principals as Owners and Borrowers, hereinafter collectively referred to as "Borrower"; which shall be a series of single-asset entities controlled by the Key Principals in form and format acceptable to SFIG.

**LOAN TYPE:** Refinance / Cash Out.

**LOAN PURPOSE:** To refinance existing debts at low LTV and allow cash out for expansion via construction or acquisition of new hotels.

**LOAN AMOUNT:** **$85,200,000 USD** is the estimated loan amount based upon the assumed interest rate and Operational budget indicated in the Borrower provided materials as of today's date. Loan amount is subject to operational budget, the lesser of the final underwritten maximum Loan-To-Value (LTV), Loan-To-Cost (LTC), for any renovations, or minimum Debt

*Initials* **A.S**

Service Coverage Ratio (DSCR), necessary Interest Reserve or escrows, and; subject to the remaining terms and underwriting conditions contained herein.

| Estimated Loan Budget | |
|---|---|
| Current Debt | $48,700,000 |
| Cash Out | $30,000,000 |
| Contingent Cash Out | $5,000,000 |
| Loan Fees | $1,500,000 |
| Total | $85,200,000 |

**INITIAL FUNDING:**

Funding will not be approved, submitted, placed or disbursed in any form or portion until such a time as all necessary 3rd party reports and all Commitment Exhibits have been received from Borrower and approved by SFIG, which reports and exhibit documents are required in order to be able to substantiate and support the foundation of the debt placement; which funding shall not occur until final closing of the loan(s).

**RATE:**

**Permanent:**

An interest rate per annum equal to 331 basis points over the "Base Rate" as herein defined as the ten (10) year U.S. Treasury Note (or similar index), fixed, principal and interest, paid in advance, in equal installments with reserves, if any, calculated on the daily outstanding balance of the Loan on the basis of a year of 360 days and paid for the actual number of days elapsed. **Today's rate would be 5.10%**

**TERM:**

**Permanent:**

10 Years.

**EXTENSIONS:** **None.**

**AMORTIZATION:**

25 Years

**MAXIMUM LTV:**
*(Loan to Value)*

***(Subject to Final Underwriting and Financial Reviews)***

**Permanent:**

65% maximum allowable.

**MINIMUM DEBT SERVICE COVERAGE RATIO:**

**1.45:1**

**JUNIOR LIENS:**

Any secondary junior debt secured by a lien or any security interest on the Subject Property, Collateral or Borrowing Entity either at closing or at any time during the term of the loan without prior approval of is prohibited.

*Initials*

**GUARANTEES:**

    **Permanent:**               Personal and Corporate Required

**MANAGEMENT AGREEMENT:** During the term of the loan, the Project and Subject Property shall have oversight and management control by the Borrower or a Managing/Project Agent acceptable to SFIG pursuant to a Project Management Agreement, which also must be in a form and substance acceptable to SFIG.

**MINIMUM ANNUAL AVERAGE OCCUPANCY:** 60% average annual occupancy.

**MINIMUM NET WORTH OF BORROWER/SPONSOR:** Equal to 100% of the gross loan amount, inclusive of all Borrowers or Investors.

**MINIMUM NET LIQUIDITY OF BORROWER/SPONSOR:** Equal to **5%** of the gross loan amount, inclusive of all Guarantors/Borrowers/Sponsors.

**MINIMUM NET CASH INVESTMENT REQUIRED:** Borrower shall demonstrate sufficient cash or other forms of equity invested in the Property evidencing at risk capital of the Borrower.

**EQUITY REQUIREMENT:** The Final Loan amount shall not exceed the Loan to Value (LTV) as outlined in this document and as determined by a currently dated MAI Full Narrative Self-Contained Appraisal engaged by and approved by SFIG. At SFIG's option, such Borrower equity may be satisfied, partial or in full, by Borrower's documentation of cash equity in the project and/or such equity may be based on an appraisal that shall be satisfactory in the sole discretion of SFIG. Prior to SFIG final submission for project approval, Borrower will provide evidence satisfactory to SFIG that the Borrower has contributed the difference between the acquisition costs of the Subject Property and the loan amount in cash deposited into an account which can be verified by SFIG and which shall remain in that same account until and thru closing of the loan.

**PREPAYMENT:**

                Permanent:      The Loan(s) will include a prepayment penalty and may provide for some portion of the Loan term where prepayment will not be allowed. Prepayment penalties may vary subject to underwriting and financial reviews. Prepayment penalties may be waived at the discretion of SFIG if a new loan

with Borrower is anticipated to replace any prepaid loan. Typical prepayment penalties follow a declining fee schedule. For example, 3% in years 1-3, 2% in years 4-6, 1% in years 7-9, and 0% in year 10.

**APPROVAL OF ENTITY:** The form, structure and capitalization of the Titled Owner and Borrower must be satisfactory to SFIG.

**SPECIAL CONDITIONS:** **The Borrower acknowledges that this loan represents a special circumstance. SFIG is willing to refinance existing debts and provide cash out according to the development plan provided to us. Specifically, that Borrower will use all funds from cash out for the purpose of building 5 new hotels and acquiring 2 existing hotels. Substitutions or replacement projects will be allowed. The amount of cash out listed above is based upon a 70% LTC requirement for each new project. Additionally, an amount of contingent cash out has been allowed to cover any possible price escalations. Borrower agrees that the sum of funds listed as cash out will be held in escrow and shall only be used to purchase hard assets such as land, or buildings. Additionally said funds will be released from escrow for the purpose of equity in closing construction loans. The cash out funds will only be used for the addition of hard assets to the balance sheet of the holding company. Borrower agrees that the cash out funds will not be used for soft costs, fees, services, reports, studies, or any other cost or fee which is not a hard asset. Furthermore, Borrower agrees that it gives SFIG the first right of refusal to finance each of the planned new hotels. Conversely the cash out funds may be used for the debt service and support of the subject properties in the event of market downturn.**

**SECURITY:** In summary, security for the Loan shall consist of one or more of the following:

(i) First Mortgage/First Deed of Trust/Promissory Note to the real estate located **in Alabama and Florida, consistent with and disclosed in the Borrower's Financing Package dated and received on or before January 5th, 2022.** (ii) a first priority collateral assignment of all consultant contracts, leases, rents, reserves and profits from the Subject Property and or operation of the Subject Property (iii) a perfected first security interest under the Uniform Commercial Code on all of the furniture, fixtures and equipment now or hereafter installed in, affixed to, placed upon or used in connection with the Subject Property other than that owned by tenants (iv) a consent, subordination and recognition agreement,

*Initials* **AP**

and any other contracts relating to the operation of the Subject Property, and the collateral assignment of any leases, permits, approvals and warranties applicable to the Subject Property or that have signed leases to occupy space in the Project following completion of construction (v) an environmental indemnity agreement indemnifying SFIG against all claims and causes of action based on the presence, use or release of any hazardous substances on or affecting the Subject Property (vi) such other security interests and instruments relating to the Subject Property as Lender and its counsel may reasonably require in order to evidence or perfect the liens intended to be granted pursuant to the Loan Documents, including but not limited to customary closing certificates and other agreements.

**LOAN FEES:**

A "Loan Fee" relating to the loan shall be paid to SFIG as follows:

**Permanent:**

A fee of <u>One (1%) Percent</u> of the gross Loan amount shall be paid by the Borrower to SFIG at the closing of the Permanent Loan.

Loan Fees shall be deemed earned at time SFIG delivers to Borrower, loan commitments acceptable to Borrower, and paid upon initial funding of any portion of loan proceeds. In the event SFIG and Borrower by mutual consent either orally or in writing forego a formal written commitment and proceed with preparation of actual Loan documents, advance deposits, letters of intent, or other such actions precedent to closing or obtaining Loan funds in accordance with the Commitment, then such actions will constitute a commitment as referred to in the Commitment.

**COOPERATING BROKER(S):**

<u>Luna Capital</u>

Borrower acknowledges and agrees that a fee of (and not to exceed) ½% of the Loan amount is payable by the Borrower to the above-identified "Cooperating Broker" at closing of the Loan. Such fees **are not** included in the Loan Fee(s) to be paid to SFIG. Borrower hereby acknowledges and agrees that SFIG is not required to compensate the above-identified Cooperating Broker or otherwise collect a fee on behalf of such Cooperating Broker.

All brokers, agents and third party intermediaries are strictly independent, and are not authorized to represent SFIG as a company, nor make any statements of intent, policy, claims or promises on behalf of the company or any of its executives or staff. SFIG shall not be bound or obligated by, and no

*Initials*

person shall take action in reliance upon, statements of any such independent third parties. Brokers represent their own clients to SFIG, and do not "represent" SFIG to any potential or current clients. All third party contracts and claims purporting to provide or include SFIG services, in whole or in part are willfully and knowingly fraudulent misrepresentations. Any retainers requested or received by or paid to any third parties are not received by SFIG, do not create a client relationship and do not cause the provisioning of or change in any SFIG services. All SFIG services are provided strictly in the context of a direct and contractual Financial Institution relationship.

**AUTHORIZATION FOR LOAN FEES:**

Borrower/Titled Owner will irrevocably authorize SFIG to include the above Loan Fees as a part of the closing statement and pay SFIG, the Cooperating Broker, and/or their assigns, directly from Loan or funding proceeds the sum(s) as disclosed and directed on the closing statement. However, if any such Loan is funded without disbursing the applicable fees to SFIG, then Borrower shall be liable for payment of such fees to SFIG. In the event that Borrower accepts any loan terms, loan proceeds from any Investor(s) and/or Capital Partner(s) associated with Borrower by SFIG for any portion of the Subject Property or Project or any other phase thereof, regardless of whether the loan terms or type of financing accepted are different from those outlined herein or otherwise involve any other type of financing, the obligations of Borrower to pay SFIG the fees set forth herein shall remain in full force and effect, and all fees payable hereunder shall be deemed earned by SFIG upon acceptance of such loan terms or financing by Borrower.

**COMMITMENT FEES:**

A **$150,000** U.S.D. Conditional Commitment Fee shall be payable to SFIG at the execution of the Conditional Loan Commitment by Borrower and shall be credited against Loan Fees payable to SFIG at Loan Closing.

These monies shall be used solely for the purpose of the Conditional Loan Commitment request, inclusive of SFIG out of pocket costs for site visits, travel, lodging, car rental, internal underwriting and processing charges including overnight mail services, underwriting resources and personnel, etc., and are not allocated for third party report engagements.

In the event that the Borrower complies and qualifies with all of the underwriting requirements contained in the LOI and in the Loan Commitment, including the delivery of all the items, documents and conditions listed on the Exhibits

*Initials*

"A" and "B" of the Commitment (collectively the "Exhibits") and any other documents or underwriting requirements that may be reasonably requested and necessary including resolution of any reasonable underwriting issues that may arise, at the discretion of SFIG, and are provided to SFIG in a "Timely Manner" and then if SFIG is unable to complete funding as stated herein, the Commitment Fee will be refundable within thirty (30) business days of receipt of written Termination of the Commitment minus any out-of-pocket hard costs. The Commitment Fee will be forfeited if one or more of the following occur:

(i)     The Borrower does not comply with or meet the above conditions and those conditions set forth in the LOI and in the Loan Commitment and Exhibits;

(ii)    The Borrower accepts or initiates financing for the Subject Property from any third party during the term of the Loan Commitment;

(iii)   Borrower terminates the Loan Commitment for any reason prior to the delivery of all and subsequently requested Exhibit items and all previously required Exhibits;

(iv)    The Borrower loses ownership or control of the Subject Property through the action of law or for any other reason or act;

(v)     If at any time during underwriting and financial review SFIG shall determine that any of said material or information is in error or constitutes a misrepresentation or fraud, and such error, misrepresentation or fraud materially affects the ability of SFIG to provide the financing requested by Borrower and contained in the Letter of Intent or Loan Commitment;

(vi)    If the market where the Subject Property is located experiences significant and material market changes that affect the ability to fund within the prescribed guidelines in the LOI and Loan Commitment and the Borrower is not willing or able to accept revised loan structure(s);

(vii)   If Borrower is not timely (Timely Manner) in the delivery of required Exhibit documents, defined as received in SFIG offices within **60 calendar days** from execution of Commitment, exclusive of any open 3rd party reports, as determined by SFIG.

**SITE VISITS:**     Borrower agrees to make arrangements for the inspection(s) of the Subject Property as well as provide access to any Subject Property records that SFIG or its representatives deem reasonable or necessary both on site at Subject Property and at Borrowers' offices or place of business.

*Page 8 of 18*                          *Initials*

**COSTS AND EXPENSES:** Borrower shall pay all additional costs and expenses incurred in connection with a Commitment and the preparation for and the closing of the Loan, whether the Loan is closed or not, including appraisal fees, market and feasibility studies, engineering examination fees, environmental audit fees, inspection fees, surveyor's fees, legal fees (including fees of legal counsel of Lender), lender loan fees and all out-of-pocket expenses related to the Loan. SFIG shall not bear any out-of-pocket expenses whatsoever in connection with a Commitment or any costs incurred by the Loan.

**TIMING TO CLOSE:** Estimated at approximately **30-90** business days for closing after receipt of executed Loan Commitment and after receipt of all required Loan Exhibit documents for underwriting.

Final underwriting for approval of Loan Request will not be submitted, approved or completed by SFIG until all documents as required by the Exhibits, or subsequent Exhibit document(s) reasonably requested by SFIG, are received, reviewed and accepted by SFIG; or as determined by SFIG in its sole discretion.

**REPORTS:** Approvals of the loan shall be conditioned upon satisfactory completion of the following in accordance with SFIG specifications and requirements:

General

M.A.I. Self Contained Full Narrative Appraisal
*(Current within previous 6 months)*
Engineering Report
Environmental Report, Phase I or Phase II if necessary
Independent 3rd party Market and Feasibility Study
Site Inspection Report (SFIG to complete)
Credit Reports
Insurance Coverage Review Report
Loan Commitment Exhibits

**Wherever possible, SFIG will attempt to use any existing and current third party report, subject to SFIG approval, current updates and letter of conveyance.**

**All 3rd party Reports, unless previously agreed to or accepted by SFIG, must be engaged and managed by SFIG within the appropriate timetable. If new reports are required Borrower cannot engage the report and if engaged Borrower does so at their own risk.**

*Initials* 

**RIGHT TO RELY:**

Borrower further understands and acknowledges that SFIG will rely on material and representations made by Borrower prior to the issuance of the Commitment and will rely on future material or information given or otherwise received by SFIG from Borrower or Borrower's Representative, Agent or Broker(s). Borrower agrees and acknowledges that all exhibits items are required and that no exhibit document or item as listed on the Exhibit at start of underwriting or subsequently added thereafter by SFIG for cause shall be waived, eliminated or determined to not be required except with the express written agreement of the same waiver by the Principal of Summit Financial and Investment Group, LLC. Borrower further agrees that if, at any time, SFIG shall determine that any of said material or information is in error or constitutes a misrepresentation, and such error or misrepresentation may materially affect the ability of SFIG to provide the financing requested by Borrower SFIG may, in its sole discretion, terminate the Commitment or modify its terms and conditions; or if Borrower is not timely (Timely Manner) in the delivery of required Exhibit documents, defined as received in SFIG offices within **60 calendar days** from execution of Commitment, the Commitment Fee will become non-refundable.

**ASSIGNMENT:**

The Loan may not be assigned without prior written consent and approval by SFIG and payment of a 1% transfer fee plus all costs, fees and expenses incurred by Borrower or Assignee Borrower (including attorneys fees) in connection with such transfer, except that such consent and fee shall not be required in the case of transfers by reason of death or operation of law. The assignee shall assume and agree to pay the indebtedness evidenced and secured by the Loan Documents (subject to a recourse provision contained therein) pursuant to documents reasonably required by Lender.

Borrower may not assign their rights under this Letter of Intent or the Loan Commitment to other persons or legal entities without the prior written consent of SFIG and its Principals.

**UNDERWRITING REQUIREMENTS:**

A Loan Commitment shall be conditioned upon satisfactory completion of the underwriting of the Loan Commitment Exhibits and completion and satisfactory review of the following:

(a)     an M.A.I. Appraisal Report, Engineering Report, Environmental Report, 3rd party Feasibility Report and credit reports as set forth previously; and,

*Initials*

(b) acceptable validated operating statements (P&L's or Income Statements) for the Subject Property for the most recent prior three year period and current year to date and proforma operating budget for the first five years covering the proposed Loan period, and acceptable Borrower financial statements including concurrently dated Income Statement(s) and Balance Sheet(s) within the most recent sixty (60) day period; *all of which information Borrower agrees will be required and provided to SFIG on an ongoing monthly and availability basis and shall be provided by the Borrower routinely without prompting or demand by SFIG (If applicable to Subject Property).*

(c) inspections of the Subject Property by SFIG; and,

(d) final determination that the underwritten proforma and/or annual net income operating income of the Subject Property, based in part on the financial statements set forth in (b) above is acceptable to SFIG; and,

(e) no subordinate debt will be allowed without SFIG express written consent; and,

(f) receipt and satisfactory review of all exhibits for Loan processing specified in Exhibit "A" attached to the SFIG Loan Commitment, and such other related documents with regard to the Subject Property and the Borrower as SFIG may request in writing (A copy of Exhibit "A" to the Loan Commitment and the Borrower Credit Authorization and Certification Form shall be attached to the Loan Commitment). *all of which information Borrower agrees will be required and provided to SFIG on an ongoing monthly and availability basis and shall be provided by the Borrower routinely without prompting or demand by SFIG.*

(g) all Exhibits and documents which are part of any Exhibit shall be provided to SFIG on a timely basis. Exhibit documents may be provided by facsimile, email, courier, postal or hand delivery. *In the event any document is provided by facsimile or email to SFIG such document must also be provided in hard copy form in the highest quality available to Borrower, unless otherwise waived by SFIG. And such documents, even though may be used for underwriting purposes, shall not constitute full delivery and acceptance until hard copy of the same documents are received by SFIG either by courier, postal or hand delivery and in acceptable quality and condition. No final submission for any funding approval or consideration for*

*credit approval shall be submitted by SFIG until such documentation has been received in acceptable format and quality.*

(h) SFIG reserves its rights to any syndication of this loan and or its Loan Commitment or funding of the Commitment.

**ESCROWS FOR INTENT RESERVE, TAXES, INSURANCE:**

At the closing of the Loan, as a condition to disbursement of Loan proceeds to the Borrower, an escrow may be required from Loan proceeds one or more of the following:

(a) a loan in process debt service reserve account for debt service of the loan during the term of the Loan; and,

(b) amounts to pay currently due property taxes, other assessments and insurance premiums; and,

(c) appropriate reserves for scheduled or proposed future tenant improvements and leasing commissions and reserve to maintain future minimum Debt Service Coverage Ratio requirements.

**LOAN FEASIBILITY AND REPAYMENT:**

The Borrower acknowledges that the intent of the loan is to be repaid according to the terms and conditions contained in the LOI and Conditional Commitment. Prior to final loan commitment SFIG will determine the feasibility of the project and the likelihood of the loan being repaid as a part of the underwriting process. If it is determined, by SFIG, that the project or loan is not feasible, which is to say it is unlikely that repayment will occur according to the terms and conditions in the LOI and Conditional Commitment, then SFIG retains the right to modify the loan terms in order to achieve feasibility. If modified loan terms cannot increase the feasibility of the loan or project SFIG retains the right to deny the loan. The Borrower acknowledges that if the aforementioned events occur or if any of the following events occur the loan may be denied and the Commitment Fee forfeit including but not limited to:

(i)   In the event of Subject Property acquisition, the purchase price exceeds the "As is," value as determined by third party independent MAI appraisal and/or the Subject Property is unable to meet debt service requirements per the terms and conditions of the LOI and Conditional Commitment.

(ii)  Regarding construction of the Subject Property, the total costs exceed the "as complete" value as

determined by third party independent MAI appraisal and market feasibility report and/or the stabilized value as defined in the appraisal after Subject Property completion.

(iii) Concerning existing properties, the Subject Property's historical and current trends in net operating income cannot support the debt service obligations contained in the LOI and Conditional Commitment and/or does not yield a value based upon capitalization rates, as determined by an independent third party MAI appraisal, which is sufficient per the terms and conditions of the LOI and Conditional Commitment.

(iv) Relating to non-performing or under-performing properties, the Subject Property cannot obtain a sufficient value and/or NOI including any renovations or repositioning of the property as determined by an independent third party MAI appraisal and market feasibility report.

**CLOSING REQUIREMENTS:** Closing and funding of the Loan will occur only upon the delivery to and approval by SFIG and our Legal Counsel of the following matters:

(a) title insurance and survey prepared in accordance with SFIG specifications; and,

(b) evidence of payment of all municipal charges and assessments, including real estate taxes, any outstanding liens; and,

(c) organizational documents and certificates of qualification of Borrower and, if applicable, the general partner of the Borrower; and,

(d) evidence of compliance with all laws, ordinances, rules and regulations applicable to the Subject Property, including zoning, building, environmental and land use matters; and,

(e) abatement, operations maintenance and/or repairs programs to be undertaken with respect to the matters set forth in the engineering and environmental reports; and,

(f) casualty, owner's risk, liability, rent/income interruption, flood (if applicable), worker's compensation, and earthquake insurance (if applicable) prepared in accordance with Lender's specifications.

*Initials* 

(g) Borrower acknowledges and agrees that; (a) SFIG shall be entitled to rely upon the information, materials, and representations provided or made by Borrower prior to execution of the Commitment, and (b) SFIG shall be entitled to rely upon all information, materials and representations provided or made by Borrower following execution of the Commitment in connection with this LOI. Borrower further agrees that if, at any time, SFIG determines that any of said materials, information or representations are in error or are false or do not support the funding requirements of this LOI and the Commitment, and such error, misrepresentations or information may materially affect the ability of SFIG to provide the financing requested by Borrower, SFIG may, in its sole discretion, terminate the Commitment.

**LOAN DOCUMENTS:** The loan shall be evidenced, governed and secured by SFIG standard loan documents, which may be modified by the SFIG or its counsel or assigns to the extent necessary to reflect (i) laws and practices customary in the state where the Subject Property is located and (ii) special facts and circumstances as determined by SFIG. After the closing date, the terms of the Loan Documents shall supersede the terms of this Letter of Intent and the Loan Commitment.

**UNDERWRITING DOCUMENTS:** All documents received in the process of underwriting shall remain in the possession of SFIG and is considered SFIG work product.

**MODIFICATION OR TERMINATION:** Notwithstanding the issuance of a Letter of Commitment, SFIG may modify the amount or terms of Loan or may elect to terminate the commitment, at its option in the event that:

(a) Borrower fails to complete the underwriting requirements set forth above and in the Commitment; and,

(b) the reports, financial statements and analyses, and other underwriting requirements to be submitted by Borrower in accordance with underwriting requirements set forth above do not fully support the assumptions on which this Letter of Intent, an Commitment or a Letter of Commitment is based; and,

(c) there is any material inaccuracy or there occurs any material adverse change in any information, adverse current market conditions that directly affect the Subject Property, representations or materials submitted or in support of the Commitment for the Loan, including any information, representations or materials reflecting the financial

condition or the net operating income, future or present, of the Subject Property, Borrower, any general partner thereof or any Guarantor, or the default by any such party under any material obligation to any third party; and,

(d) there shall occur any transfers of interests in the Borrower or the Subject Property; and,

(e) the Subject Property suffers material damage, waste or destruction; and,

(f) there shall be commenced or threatened against the Subject Property any eminent domain or taking proceeding; and,

(g) there occurs any event or circumstance which has a material adverse impact on the Borrower or the Subject Property or its value, including, without limitation, any material proceedings or actions pending or threatened against or adversely affecting the Borrower or the Subject Property; or,

(h) Borrower shall fail to satisfy the requirements of a Letter of Commitment in a Timely Manner; or,

(i) in the event that the Borrower or any general partner or key sponsor thereof shall become insolvent or make a general assignment for the benefit of creditors.

**INVESTIGATION AND INQUIRIES:**

The undersigned hereby authorizes SFIG to conduct such investigations and inquiries as to its credit, operations, the Subject Property, the Borrower and/or its Principals, affiliates and the collateral as well as all necessary inquiries with any governing municipality or agency as to the current condition of, but not limited to the Subject Property's zoning, entitlements, approvals and permits as shall be necessary or desirable in connection with the Loan and monitoring of the Loan, if made including but not limited to credit references, credit reports or background checks. By this authorization, persons of whom SFIG may make such inquiry are empowered by the undersigned to cooperate with and supply all requested information to SFIG

**CONFIDENTIALITY:**

SFIG and Borrower/Applicant (Applicant) agree not to disclose any Confidential Information at any time with any third party, entity or business not directly related to this transaction and the Subject Property other than as provided for as follows:

*Initials*

It is acknowledged by SFIG and the Applicant that the Confidential Information to be furnished is in all respects confidential in nature, and that any disclosure or use of the same by either SFIG or Applicant, except as provided in the Letter of Intent (LOI) or Conditional Commitment, may cause serious harm or damage to its owners and officers. Therefore, SFIG, the Applicant, their officers, agents, and assigns agree that both SFIG and Applicant will not use the Confidential Information furnished and mutually exchanged for any purpose other than as stated in the LOI and Conditional Commitment, and agree that the Receiving Party, SFIG or Applicant, will not either directly or indirectly by agent, employee, assigns or representative, disclose this Information, either in whole or in part, to any third party; provided, however that (a) the Information furnished may be disclosed only to those directors, officers and employees of the Receiving Party and to the Receiving Party's advisors or their representatives who need such Information for the purpose of evaluating any possible transaction (it being understood that those directors, officers, employees, advisors and representatives shall be informed by the Receiving Party of the confidential nature of such information and shall be directed by the Receiving Party to treat such Information confidentially), and (b) any disclosure of the information may be made to which Disclosing Party consents in writing.

**MISCELLANEOUS:**     SFIG shall be under no obligation to make a loan unless all of the requirements of this LOI or the Commitment have been fully satisfied. **Time is of the essence with respect to all dates, periods of time and expressions of interest set forth in this Letter of Intent.**

Issuance of this Letter of Intent is not a commitment to make or close a loan and it is not a certification or final acceptance of the materials and documents provided by the Borrower and available to SFIG at the issuance of this Letter of Intent or the Commitment. Any final loan submission and/or Loan Commitment will be subject to the receipt and acceptance by SFIG of all of the requisite documents required in the Commitment and its Exhibits or additional documentation as reasonably required of the Borrower during underwriting and financial review.

(Please be advised that incoming phone calls to SFIG may be recorded or monitored for quality assurance and accuracy.)

**EXPIRATION:**     **This Letter of Intent shall expire on MONDAY, JANUARY 31ST, 2022.**

*Initials*

<u>After this date this Letter of Intent shall be of no force or
effect and all terms, rates and conditions will be withdrawn.</u>

If this Letter of Intent explaining the currently available terms and conditions of the proposed loan
are acceptable - SFIG is prepared to issue a Loan Commitment and proceed forward with the
underwriting process for this project. Please acknowledge your understanding of the above terms
by executed this Letter of Intent below. If this is not acceptable or if it is believed that needed
modifications are required or suggested to this Letter of Intent please call us directly to discuss
possible changes and/or to see if a short extension has merit in the interim.

## <u>DO NOT SIGN THIS AGREEMENT IF YOU ARE NOT IN FULL ACCORDANCE WITH ITS TERMS AND CONDITIONS.</u>

I/We understand and accept the stated parameters, terms and condition of the Letter of Intent and
by signature authorize SFIG to issue a Loan Commitment with the required Exhibits.

### <u>(PRINT or WRITE LEGIBLY)</u>

Company/Borrower: _Virendra Patel_

Borrower/Contact: _Angela Patel_

Title: _Owner_

Address: _1381 W Fairway Drive_

City, State, Zip: _Gulf Shores, Alabama 36542_

Office Phone: _____

Fax: _____

Cell Phone: _251-583-6394_

Email: _angela@anrgroup.com_

*Initials* ___

Signature: _____

Date Signed: _____ 2-2-22 _____

If there questions or comments, we are interested in hearing from you directly.  Or, if you wish, you are welcome to visit our office in person to discuss the financing.

We do look forward to working with you on this financing.

Sincerely,

Ben Powell
Loan Officer

For and in behalf of:

**Summit Financial and Investment Group, LLC**
10421 South Jordan Gateway
Suite 600
South Jordan, Utah 84095
Office: (801) 944-4320
Fax: (801) 944-4322
sfig@sfig.com

*Initials*

FILED DATE: 2/8/2023 11:38 AM 2023LU01306

# EXHIBIT

# C

FILED DATE: 2/8/2023 11:38 AM   2023CL001306

# SUMMIT FINANCIAL AND INVESTMENT GROUP, LLC

**10421 South Jordan Gateway ◆ Suite 600 ◆ South Jordan ◆ Utah 84095**
**(801) 944-4320 Office ◆ (801) 944-4322 Fax ◆ Email:  sfig@sfig.com**
*Real Estate Investment Bankers*

Friday, February 4th, 2022

Mrs. Virendra Patel
A&R Group
1544 W. 2nd Street, Suite114
Gulf Shores, Alabama 36542

Dear Mrs. Patel:

Attached, you will find the Loan Commitment for your properties located in Gulf Shores, AL, Pensacola, FL, and Orange Beach, AL. The terms and conditions reflect those found in the Letter of Intent which you previously executed on February 2nd, 2022.

**Please return the fully executed Commitment and the required Commitment Fee on or before the expiration date which is <u>Friday, February 11th, 2022.</u>** At that same time please return as many of the documents listed in the Loan Exhibits as possible.

All of the listed documents in the Exhibit are necessary for underwriting and will be required but some of these documents may not be readily available to you at this time and will need to be provided by you as we continue with the underwriting process. This is acceptable, usual and customary. **<u>Please do not hold up the execution of the Commitment with the impression that all of the exhibit documents must be provided all at once prior to the Commitment execution.</u>**

When we receive the executed Commitment and the Commitment Fee we will immediately update the Exhibits files for you with what we already have on hand. We also will do an update and send it to you at the start of each week through underwriting. These updates will contain the most current list of what we have and what may still be open or not resolved. We will make comments in the Exhibit List concerning the documents provided in the event that they do not meet the intended requirement. If you have questions on any document or Exhibit item please call to discuss.

We look forward to completing this funding for you and to a long and profitable relationship. As soon as the executed Commitment is received with sufficient receipt of required documents from the Exhibit we will schedule a time for a personal visit to be on-site and examine the property location and surrounding locations.

We welcome any questions or comments you may have. We are also very willing to meet with you in our offices, if needed. We do suggest that avoid any mistakes in communications that you contact us directly as needed by phone, email or fax.

Best regards,

Ben Powell
Loan Officer

# SUMMIT FINANCIAL AND INVESTMENT GROUP, LLC

**10421 South Jordan Gateway ◆ Suite 600 ◆ South Jordan ◆ Utah 84095**
**(801) 944-4320 Office ◆ (801) 944-4322 Fax ◆ Email: sfig@sfig.com**
*Real Estate Investment Bankers*

## PERMANENT LOAN
## CONDITIONAL COMMITMENT

**Date of Commitment:** Friday, February 4th, 2022

**Date of Commitment Expiration:** Friday, February 11th, 2022

**Property or Project Name:** 10 Property Refinance and Cash Out

**Property Address:**

| Brand | Location |
|---|---|
| Beachside Resort | Gulf Shores, AL |
| Holiday Inn Express by IHG | Gulf Shores, AL |
| Motel 6 by M6 | Gulf Shores, AL |
| Red Roof Inn | Pensacola, FL |
| Courtyard by Marriott | Gulf Shores, AL |
| Quality Inn by Choice | Gulf Shores, AL |
| Fairfield Inn by Marriott | Orange Beach, AL |
| Microtel Inn by Wyndham | Gulf Shores, AL |
| Red Roof Inn | Gulf Shores, AL |
| Staybridge Suites by IHG | Gulf Shores, AL |

**Business Address:** 1381 W. Fairway Drive
Gulf Shores, AL 36542

## Number of Buildings and Total Land Area:

10 separate properties with appurtenant structures, amenities, and parking.

We are pleased to provide you with this Commitment that Summit Financial and Investment Group, LLC (SFIG) has prepared regarding your application for financing. This offer of commitment is conditional. The obligation of SFIG to lend pursuant to the terms specified herein is subject to compliance with all of the following terms and conditions in reliance by SFIG on the information provided by, or on behalf of, the Borrower being true, complete and correct in all respects. This letter is meant to outline the basic terms and conditions of an approval and will serve as the basis of the final loan documents. The actual loan documents will contain considerably more language describing the rights and remedies of SFIG, event of default, positive and negative covenants, and obligations of the Borrower. The terms and conditions presented in this commitment letter are available for a period of 60 days from the time of issuance of the letter.

Initials_____

FILED DATE: 2/8/2023 11:38 AM    2023L001306

This exclusive Commitment is hereby agreed to by the Borrower, Owner, Guarantor, or Titled Owner identified below (whether one or more collectively referred to as, "Borrower") to Summit Financial and Investment Group, LLC ("SFIG"), **for a first mortgage commercial term loan** (the "Loan") for the project identified above (the "Project"). This exclusive Commitment shall be effective from the date of signature hereto by Borrower and shall extend for 60 business days from receipt of all items from Borrower on the attached Exhibit "A" and compliance with all terms on Exhibit "B" (the "Commitment Term") hereto and any other additional Exhibits reasonably required as a result of underwriting (the "Commitment Period"). It is further agreed that this Commitment will remain in full force and effect following the initial period stated above until terminated in writing by Borrower. In consideration of the above, Borrower agrees to this Commitment on the following terms and conditions:

## 1.    Information Concerning the Borrower:

Key Principals Name:    Virendra Patel

Address:    1381 W. Fairway Drive
Gulf Shores, AL 36542

Telephone Number:    251-583-6394

Email:    Angela@anrgroup.com

## 2.    If Title to the Project will be Held by the Borrower under a Separate Legal Entity (owner), Please Complete This Section (fill out if different from Borrower):

Name of Titled Owner:    A&R Group and its subsidiary companies

Type of Entity
(i.e.: corporation,
partnership, etc.):    To be determined.

Relationship to Borrower
(Including any ownership
to other parties):    Key Principal is the Principal and Owner of the Titled Owner.

Address of Titled Owner:    1381 W. Fairway Drive
Gulf Shores, AL 36542

State of organization:    Alabama

Organization Date:    To be determined.

Tax ID Number:    To be determined.

Initials_____

3.    **Basic Loan Information:**

| | |
|---|---|
| SFIG Program | _____ Construction Only |
| (Check) | _____ Construction w/Mini-Perm/Permanent Loans |
| | \_\_X\_\_ Refinancing |
| | _____ Acquisition |
| | \_\_X\_\_ Fixed Rate |
| | _____ Floating Rate |

A specific list of the Exhibits to be submitted by the Borrower as a part of the Commitment prior to Final Loan Underwriting, submission(s), approval(s) and closing(s), by SFIG, its Capital Partners and Investors, (collectively SFIG), are attached to this Commitment as <u>Exhibit "A"</u>. Exhibit "A" is incorporated in, and made a part of this Commitment.  Borrower agrees to submit the items set forth in Exhibit "A" as well as additional information reasonably requested by SFIG for underwriting of the Loan.  Exhibit "A" items are required to complete the processing and final underwriting of this Commitment and, Borrower by signature hereto, agrees to expedite those items to SFIG for the completion of this commitment and as a requirement of the exclusive time period hereof.  In addition, Borrower agrees that certain documents and information will be required on an ongoing monthly basis and shall be identified in the Exhibits and shall be provided by the Borrower routinely without prompting by SFIG. ***The Letter of Intent previously executed is hereby integrated into and made a binding part of this Commitment and shall be known as Exhibit "B".***

| | |
|---|---|
| **PROPERTY ADDRESS:** | Gulf Shores, AL, Pensacola, FL, Orange Beach, AL. |
| **PROPERTY TYPE:** | Branded Hotels. |
| **OWNERS BORROWERS BORROWER:** | A&R Group, and its Key Principals as Owners and Borrowers, hereinafter collectively referred to as "Borrower"; which shall be a series of single-asset entities controlled by the Key Principals in form and format acceptable to SFIG. |
| **LOAN TYPE:** | Refinance / Cash Out. |
| **LOAN PURPOSE:** | To refinance existing debts at low LTV and allow cash out for expansion via construction or acquisition of new hotels. |
| **LOAN AMOUNT:** | **$85,200,000 USD** is the estimated loan amount based upon the assumed interest rate and Operational budget indicated in the Borrower provided materials as of today's date.  Loan amount is subject to operational budget, the lesser of the final underwritten maximum Loan-To-Value (LTV), Loan-To-Cost (LTC), for any renovations, or minimum Debt |

Initials_____

FILED DATE: 2/8/2023 11:38 AM  2023L001306

Service Coverage Ratio (DSCR), necessary Interest Reserve or escrows, and; subject to the remaining terms and underwriting conditions contained herein.

| Estimated Loan Budget | |
|---|---|
| Current Debt | $48,700,000 |
| Cash Out | $30,000,000 |
| Contingent Cash Out | $5,000,000 |
| Loan Fees | $1,500,000 |
| Total | $85,200,000 |

**INITIAL FUNDING:**

Funding will not be approved, submitted, placed or disbursed in any form or portion until such a time as all necessary 3rd party reports and all Commitment Exhibits have been received from Borrower and approved by SFIG, which reports and exhibit documents are required in order to be able to substantiate and support the foundation of the debt placement; which funding shall not occur until final closing of the loan(s).

**RATE:**

**Permanent:**

An interest rate per annum equal to 331 basis points over the "Base Rate" as herein defined as the ten (10) year U.S. Treasury Note (or similar index), fixed, principal and interest, paid in advance, in equal installments with reserves, if any, calculated on the daily outstanding balance of the Loan on the basis of a year of 360 days and paid for the actual number of days elapsed. **Today's rate would be 5.10%**

**TERM:**

**Permanent:**

10 Years.

**EXTENSIONS:**

**None.**

**AMORTIZATION:**

25 Years

**MAXIMUM LTV:**
*(Loan to Value)*

*(Subject to Final Underwriting and Financial Reviews)*

**Permanent:**

65% maximum allowable.

**MINIMUM DEBT SERVICE COVERAGE RATIO:**

**1.45:1**

Initials_____

FILED DATE: 2/8/2023 11:38 AM   2023LU01306

**JUNIOR LIENS:** Any secondary junior debt secured by a lien or any security interest on the Subject Property, Collateral or Borrowing Entity either at closing or at any time during the term of the loan without prior approval of is prohibited.

**GUARANTEES:**

**Permanent:** Personal and Corporate Required

**MANAGEMENT AGREEMENT:** During the term of the loan, the Project and Subject Property shall have oversight and management control by the Borrower or a Managing/Project Agent acceptable to SFIG pursuant to a Project Management Agreement, which also must be in a form and substance acceptable to SFIG.

**MINIMUM ANNUAL AVERAGE OCCUPANCY:** 60% average annual occupancy.

**MINIMUM NET WORTH OF BORROWER/SPONSOR:** Equal to 100% of the gross loan amount, inclusive of all Borrowers or Investors.

**MINIMUM NET LIQUIDITY OF BORROWER/SPONSOR:** Equal to **5%** of the gross loan amount, inclusive of all Guarantors/Borrowers/Sponsors.

**MINIMUM NET CASH INVESTMENT REQUIRED:** Borrower shall demonstrate sufficient cash or other forms of equity invested in the Property evidencing at risk capital of the Borrower.

**EQUITY REQUIREMENT:** The Final Loan amount shall not exceed the Loan to Value (LTV) as outlined in this document and as determined by a currently dated MAI Full Narrative Self-Contained Appraisal engaged by and approved by SFIG. At SFIG's option, such Borrower equity may be satisfied, partial or in full, by Borrower's documentation of cash equity in the project and/or such equity may be based on an appraisal that shall be satisfactory in the sole discretion of SFIG. Prior to SFIG final submission for project approval, Borrower will provide evidence satisfactory to SFIG that the Borrower has contributed the difference between the acquisition costs of the Subject Property and the loan amount in cash deposited into an account which can be verified by SFIG and which shall remain in that same account until and thru closing of the loan.

*Page 5 of 17*

*Initials_____*

FILED DATE: 2/8/2023 11:38 AM   2023LO013O6

**PREPAYMENT:**

|  | |
|---|---|
| Permanent: | The Loan(s) will include a prepayment penalty and may provide for some portion of the Loan term where prepayment will not be allowed.  Prepayment penalties may vary subject to underwriting and financial reviews.  Prepayment penalties may be waived at the discretion of SFIG if a new loan with Borrower is anticipated to replace any prepaid loan. Typical prepayment penalties follow a declining fee schedule. For example, 3% in years 1-3, 2% in years 4-6, 1% in years 7-9, and 0% in year 10. |

**APPROVAL OF ENTITY:**

The form, structure and capitalization of the Titled Owner and Borrower must be satisfactory to SFIG.

**SPECIAL CONDITIONS:**

**The Borrower acknowledges that this loan represents a special circumstance. SFIG is willing to refinance existing debts and provide cash out according to the development plan provided to us. Specifically, that Borrower will use all funds from cash out for the purpose of building 5 new hotels and acquiring 2 existing hotels. Substitutions or replacement projects will be allowed. The amount of cash out listed above is based upon a 70% LTC requirement for each new project. Additionally, an amount of contingent cash out has been allowed to cover any possible price escalations. Borrower agrees that the sum of funds listed as cash out will be held in escrow and shall only be used to purchase hard assets such as land, or buildings. Additionally said funds will be released from escrow for the purpose of equity in closing construction loans. The cash out funds will only be used for the addition of hard assets to the balance sheet of the holding company. Borrower agrees that the cash out funds will not be used for soft costs, fees, services, reports, studies, or any other cost or fee which is not a hard asset. Furthermore, Borrower agrees that it gives SFIG the first right of refusal to finance each of the planned new hotels. Conversely the cash out funds may be used for the debt service and support of the subject properties in the event of market downturn.**

*Page 6 of 17*

Initials_____

**SECURITY:**   In summary, security for the Loan shall consist of one or more of the following:

(i) First Mortgage/First Deed of Trust/Promissory Note to the real estate located **in Alabama and Florida, consistent with and disclosed in the Borrower's Financing Package dated and received on or before January 5th, 2022.** (ii) a first priority collateral assignment of all consultant contracts, leases, rents, reserves and profits from the Subject Property and or operation of the Subject Property (iii) a perfected first security interest under the Uniform Commercial Code on all of the furniture, fixtures and equipment now or hereafter installed in, affixed to, placed upon or used in connection with the Subject Property other than that owned by tenants (iv) a consent, subordination and recognition agreement, and any other contracts relating to the operation of the Subject Property, and the collateral assignment of any leases, permits, approvals and warranties applicable to the Subject Property or that have signed leases to occupy space in the Project following completion of construction (v) an environmental indemnity agreement indemnifying SFIG against all claims and causes of action based on the presence, use or release of any hazardous substances on or affecting the Subject Property (vi) such other security interests and instruments relating to the Subject Property as Lender and its counsel may reasonably require in order to evidence or perfect the liens intended to be granted pursuant to the Loan Documents, including but not limited to customary closing certificates and other agreements.

SFIG fees as detailed in this Commitment are calculated against the maximum Loan Commitment and other financing that result from SFIG final underwriting and participation of its Capital Investors and Syndication Partners to the Borrower. Should the Borrower elect to accept from SFIG (which SFIG provided to Borrower) loan terms and amounts other than those outlined herein for any portion of the Subject Property or any other Phase thereof or any other type of financing, which may or may not require the Subject Property as collateral, this Commitment agreement shall remain in full force and effect and all fees and entitlements are deemed earned by SFIG at the time SFIG delivers said Final Commitment(s) to Borrower and shall be paid at first closing of funding.

## 4. Services to be Provided:

SFIG will use reasonable efforts (subject to final underwriting and financial reviews with the condition Borrower provides all of the required documents outlined in the Letter of Intent, this Commitment and its Exhibits) in behalf of Borrower and will conduct the necessary due diligence

*Initials_____*

FILED DATE: 2/6/2023 11:38 AM   2023LU013U6

and financial reviews and final underwriting required for this funding commitment. SFIG services will include, subject to specific requirements, but not limited to:

- Review, financial analysis, risk analysis, credit review and underwriting of all required due diligence items as set forth in Exhibit "A" and "B" of the Commitment and any other Exhibit documents as may be required from Borrower as a result of underwriting and review.

- Completion of underwriting including detailed debt and/or equity and/or joint venture analysis including investor rates of return, security, risk management/mitigation and percentage of ownership, if any.

- Commissioning and review of an M.A.I., Appraisal, Engineering Report, Phase I Environmental Assessment, Feasibility and Market Study, Credit Reports and any other required reports as a requirement of this Commitment (Conditional Loan Commitment).

- Coordination of Loan/Investment closing activities.

- Calculation of escrows for taxes and insurance, and reserves for working capital, capital improvements and replacement, and reserves for the payment of interest on the Loan.

## 5.    **Commitment, Financing Fees, and Expenses**.

Borrower agrees to pay the following fees and expenses:

**(a)**. Commitment Fee:     A **$150,000** U.S.D. Conditional Commitment Fee shall be payable to SFIG at the execution of the Conditional Loan Commitment by Borrower and shall be credited against Loan Fees payable to SFIG at Loan Closing.

These monies shall be used solely for the purpose of the Conditional Loan Commitment request, inclusive of SFIG out of pocket costs for site visits, travel, lodging, car rental, internal underwriting and processing charges including overnight mail services, underwriting resources and personnel, etc., and are not allocated for third party report engagements.

In the event that the Borrower complies and qualifies with all of the underwriting requirements contained in the LOI and in the Loan Commitment, including the delivery of all the items, documents and conditions listed on the Exhibits "A" and "B" of the Commitment (collectively the "Exhibits") and any other documents or underwriting requirements that may be reasonably requested and necessary including resolution of any reasonable underwriting issues that may arise, at the discretion of SFIG, and are provided to

*Initials_____*

FILED DATE: 2/8/2023 11:38 AM   2023LU01306

SFIG in a "Timely Manner" and then if SFIG is unable to complete funding as stated herein, the Commitment Fee will be refundable within thirty (30) business days of receipt of written Termination of the Commitment minus any out-of-pocket hard costs. The Commitment Fee will be forfeited if one or more of the following occur:

(i)     The Borrower does not comply with or meet the above conditions and those conditions set forth in the LOI and in the Loan Commitment and in the Exhibits;

(ii)    The Borrower accepts or initiates financing for the Subject Property from any third party during the term of the Loan Commitment;

(iii)   Borrower terminates the Loan Commitment for any reason prior to the delivery of all required and subsequently requested Exhibit items and any previously required Exhibits;

(iv)    The Borrower loses ownership or control of the Subject Property through the action of law or for any other reason or act;

(v)     If at any time during underwriting and financial review SFIG shall determine that any of said material or information is in error or constitutes a misrepresentation or fraud, and such error, misrepresentation or fraud materially affects the ability of SFIG to provide the financing requested by Borrower and contained in the Letter of Intent or Loan Commitment;

(vi)    If the Market and/or Property Type where the Subject Property is located experiences significant and material market changes that affect the ability to fund within the prescribed guidelines in the LOI and Loan Commitment;

(vii)   If the Market and/or Property Type where the Subject Property is located experiences significant and material changes that affect the ability to fund as originally intended and the Borrower is not willing or able to accept revised loan structure(s), providing SFIG is able to offer revised terms;

(viii)  If Borrower is not timely (Timely Manner) in the delivery of required Exhibit documents, defined as received in SFIG offices within **60 calendar days** from execution of Commitment, exclusive of any open 3rd party reports, as determined by SFIG.

*Page 9 of 17*

*Initials_____*

FILED DATE: 2/8/2023 11:38 AM    2024L003306

**(b)**. Underwriting Fee: A separate Underwriting Fee shall be paid to SFIG and/or SFIG Capital Partner(s)/Investor(s) for the processing of this Commitment to cover the costs of (i) appraisal/feasibility studies or necessary reports, (ii) engineering report to determine required escrows and initial deposit to working capital reserves, if any, (iii) Phase I environmental report, (plus costs of any lab sampling or record searches required for environmental assessment), or a Phase II if deemed necessary (iv) credit reports, (v) accounting review and (vi) SFIG and its Capital Partner(s)/Investor(s) site inspection and loan review. Borrower will be responsible for any cost overruns for items (i) through (vi) which must be paid to SFIG prior to issuance of a Final Loan Commitment and closing.

**(c)**. Debt/Loan
Financing Fee:

Permanent: A fee of One (1%) Percent of the gross Loan amount shall be paid by the Borrower to SFIG at the loan closing.

Loan financing fees shall be deemed earned at time SFIG delivers to Borrower, Final Loan Commitments, if required or necessary, acceptable to Borrower, and paid upon initial funding of any portion of loan proceeds. In the event SFIG, its Investor(s) or Capital Partner(s) and Borrower by mutual consent either orally or in writing forego a formal written Final Commitment and proceed with preparation of actual Loan documents, advance deposits, Letters of Intent, or other such actions precedent to closing or obtaining Loan funds in accordance with the Commitment, then such actions will constitute a Final Commitment as referred to in this document.

**(d)**. Cooperating Broker: Luna Capital

Borrower acknowledges and agrees that a fee of (and not to exceed) ½% of the Loan amount is payable by the Borrower to the above-identified Cooperating Broker at closing of the Loan. Such fees **are not** included in the Loan Fee(s) to be paid to SFIG. Borrower and Owner hereby acknowledge and agree that SFIG is not required to compensate the above-identified Cooperating Broker or otherwise collect a fee on behalf of such Cooperating Broker.

All brokers, agents and third party intermediaries are strictly independent, and are not authorized to represent SFIG as a company, nor make any statements of intent, policy, claims or promises on behalf of the company or any of its executives or staff. SFIG shall not be bound or obligated by, and no person shall take action in

*Initials_____*

reliance upon, statements of any such independent third parties. Brokers represent their own clients <u>to</u> SFIG, and do <u>not</u> "represent" SFIG to any potential or current clients. All third party contracts and claims purporting to provide or include SFIG services, in whole or in part are willfully and knowingly fraudulent misrepresentations. Any retainers requested or received by or paid to any third parties are <u>not</u> received by SFIG, do <u>not</u> create a client relationship and do <u>not</u> cause the provisioning of or change in any SFIG services. All SFIG services are provided strictly in the context of a direct and contractual Financial Institution relationship.

**(e)**. Authorization For Loan Fees:

Borrower hereby irrevocably authorizes SFIG and its Capital Partner(s) to include the above Loan Fees as a part of the closing statement and pay SFIG, the Cooperating Broker, and/or their assigns, directly from loan or funding proceeds the sum(s) as disclosed and directed on the closing statement. However, if any such Loan is funded without disbursing the applicable fees to SFIG, then Borrower shall be liable for payment of such fees to SFIG. In the event that Borrower accepts any loan terms or loan proceeds from any Capital Partner or Investor introduced to Borrower by SFIG for any portion of the Property or Project or any other phase thereof, regardless of whether the loan terms or type of financing accepted are different from those outlined herein or otherwise involve any other type of financing, the obligations of Borrower to pay SFIG the fees set forth herein shall remain in full force and effect, and all fees payable hereunder shall be deemed earned by SFIG upon acceptance of such loan terms or financing by Borrower.

**(f)**. Escrows:

A loan in process interest reserve account shall be escrowed from the Loan amount. (This amount may be adjusted subject to Final Loan Commitment.)

**(g)**. Other Costs & Expenses:

All costs and expenses related to the Loan or this Commitment shall be the responsibility of Borrower. Such costs and expenses include, but are not limited to, title insurance premiums and charges, survey, site inspection costs, recording fees, Capital Partner's/Investor's attorneys' fees, Capital Partners loan fees and Borrower's attorneys' fees, out of pocket processing costs, including overnight mail services, etc.

**(h)**. Right to Rely:

Borrower further understands and acknowledges that SFIG will rely on material and representations made by Borrower prior to the issuance of the Commitment and will rely on future material or

*Initials_____*

FILED DATE: 2/8/2023 11:38 AM   2023CH001306

information given or otherwise received by SFIG from Borrower or Borrower's Representative, Agent or Broker(s). Borrower agrees and acknowledge that all exhibits items are required and that no exhibit document or item as listed on the Exhibits at start of underwriting or subsequently added thereafter by SFIG for cause shall be waived, eliminated or determined to not be required except with the express written agreement of the same waiver by the Principal of Summit Financial and Investment Group, LLC. Borrower further agrees that if, at any time, SFIG shall determine that any of said material or information is in error or constitutes a misrepresentation, and such error or misrepresentation may materially affect the ability of SFIG to provide the financing requested by Borrower may, in its sole discretion, terminate the Commitment or modify its terms and conditions; or if Borrower is not timely (Timely Manner) in the delivery of required Exhibit documents, defined as received in SFIG offices within **60 calendar days** from execution of Commitment, the Commitment Fee will become non-refundable. Sections 5, 10, and 11, of this Commitment shall survive termination of this Commitment as it applies to SFIG its' Capital Partners and fees to be collected thereof.

## 6.   **Property Inspections:**

Borrower acknowledges and agrees that one or more property inspections will be conducted by SFIG and/or SFIG Capital Partners/Investors. Borrower agrees to make arrangements for the inspection(s) of the property as well as provide access to any property records SFIG or its representatives deem necessary. Any out of pocket expenses by SFIG and/or SFIG Capital Partners for property inspection shall be reimbursed to SFIG by Borrower within 15 days of billing by SFIG

## 7.   **Prepayment:**

The Loan(s) will include a prepayment penalty and may provide for some portion of the Loan term where prepayment will not be allowed. Prepayment penalties may vary subject to underwriting and financial reviews.

## 8.   **Secondary Financing:**

Secondary financing for the property will be subject to prior approval of SFIG or its Capital Partners/Investors.

*Initials*_____

FILED DATE: 2/8/2023 11:38 AM  2023LO01306

9. <u>**Commitment**</u>:

This is a Conditional Commitment for a Loan(s) secured by real estate and the guarantees of the Borrower as to Full Repayment of the Loan.  Acceptance of this Commitment by SFIG is not a final underwriting and irrevocable funding commitment to make the Loan until Borrower complies with all conditions set forth in this Commitment. Issuance of this Commitment is not a guarantee to make or close a loan and it is not a certification or final acceptance of the materials and documents provided by the Borrower and available to SFIG at the issuance of the Letter of Intent or this Commitment. Any final loan submission and/or Loan Commitment will be subject to the receipt and acceptance by SFIG of all of the requisite documents required in this Commitment and its Exhibits or additional documentation as reasonably required of the Borrower during final underwriting and financial reviews. While SFIG has agreed to provide certain services under this Commitment based on information provided by the Borrower, Borrower acknowledges that SFIG will conduct an independent review and underwriting analysis of the requested Loan, and determine for themselves (a) whether to make the Loan, and (b) the final Loan Commitment amount and terms thereof.  Borrower acknowledges and agrees that SFIG cannot provide any assurances or otherwise guarantee that SFIG will make the Loan.  Furthermore, SFIG is not responsible or liable for any delays in providing financing occasioned by SFIG or any decisions of SFIG Capital Partners/Investors not to make or fund the requested Loan/Investment.  In response to this Commitment, SFIG will undertake its best efforts to complete a Final Funding Commitment on terms that match the terms herein or are within a reasonable range of the funding terms outlined herein.  Borrower hereby acknowledges that final terms and conditions of the Loan/Investment are subject to the final underwriting determinations and existing market conditions where the Subject Property is located.

10. <u>**SFIG Right to Fees After Termination of Commitment**</u>:

This is an exclusive Commitment.  Borrower understands and agrees that the fees, costs, and expenses referred to in this Commitment shall be due and payable as provided herein, whether the proposed financing is provided by SFIG, Borrower, or a third person during the term hereof, or thereafter if financing commitment(s) are issued by SFIG, its Capital Partner(s)/Investor(s) or if Borrower receives and accepts a commitment and/or Loan/Investment funding within a twelve (12) month period following the termination of this Agreement, from any SFIG Capital Partner/Investor regarding this project and for which Capital Partner(s)/Investor(s) SFIG has registered the names thereof with Borrower within ten (10) days following the termination of this Commitment notwithstanding the fact that funding may occur at a later date.

11. <u>**Capital Partner/Investor Exclusivity and Non-Circumvention**</u>:

Borrower further recognizes and agrees that the SFIG Capital Partner(s)/Investor(s), that Borrower may be placed in contact with by SFIG, during the term of this Commitment, may be able or interested in funding various other projects for Borrower.  Recognizing that the initial contact with said Capital Partner/Investor source had been introduced by SFIG, Borrower agrees to pay SFIG a gross fee equal to one percent (1%) of the gross financing amount committed and funded from the Capital Partner(s) and/or (3%) of the gross Investment financing amount

*Page 13 of 17*

*Initials*_____

committed and funded from the Investor(s) defined in this Section on any other of Borrowers next two real estate projects (not including the Subject Properties covered under this agreement) submitted to and funded by these said Capital Partner(s)/Investor(s). Said fees shall be payable through escrow at the time of closing of any such financing which becomes the subject of this Section 11.

**12.      Review Of Loan Documents.**

Borrower agrees that this Commitment and all Loan and investment-related documents to be executed by Borrower at the closing of the Loan will be reviewed by Borrower's own legal counsel. Borrower acknowledges and agrees that SFIG is not responsible for and provides no assurances or guaranties regarding the legal enforceability of legal effect of the Loan documents. Borrower shall rely solely on Borrower's own judgment and that of Borrower's counsel with respect to this Commitment and any and all Loan documents.

**13.      Controversies And Disputes.**

In the event of any controversy, claim or dispute between the parties hereto arising out of or related to this agreement or the breach thereof, the prevailing party shall be entitled to recover attorney's fees, court costs and expenses incurred related thereto, in addition to any other remedy in law or in equity.

**14.      Governing Law; Exclusive Jurisdiction.**

This Conditional Commitment shall be under the exclusive jurisdiction of and governed by the laws of the State of Utah. Borrower and the Key Principals hereby irrevocably submit to the exclusive jurisdiction of the courts in the State of Utah for any action arising out of or related to this Commitment; and hereby waive any and all defenses that Borrower and the Key Principals may have to the exercise of personal jurisdiction over them by any court located in the State of Utah. No lawsuit or action regarding this Commitment shall be maintained in any state or jurisdiction outside of the State of Utah. Borrower, the Key Principals and SFIG knowingly, voluntarily and intentionally waive any right they may have to a trial by jury in respect of any litigation arising out of, under or in connection with this Commitment, the LOI, any term sheet or the transactions contemplated hereby or thereby.

**15.      Severability.**

If any provision of this Commitment shall be held invalid, unenforceable or illegal, this Commitment shall be construed as if it did not contain such provision, and the rights and obligations of the parties hereto shall be construed and enforced accordingly. Borrower further agrees that in the event any portion of this Commitment is ruled invalid by any state agency or court because SFIG did not have the proper licenses or meet an individual state's or country specific requirements, then SFIG shall have the option to either conform to those requirements or designate a properly licensed party to receive payment of fees and other benefits as referenced in this Commitment.

*Initials_____*

FILED DATE: 2/8/2023 11:38 AM   2023LU01306

**16.** __Survival__:

Sections 5, 9, 10, 11, 13, 14 and 20 of this Commitment shall survive termination of this Commitment as they apply to SFIG and the fees to be paid to SFIG.

**17.** __Conflicts__:

Attached hereto as Exhibit "B" is a copy of the Letter of Intent previously executed by Borrower in reference to the Loan and/or Investment. It is hereby integrated into and made part of this Commitment and as such the terms and conditions of the Letter of Intent are also made a binding part of this Commitment. To the extent there are any changes or modifications between the provisions of the Letter of Intent and the provisions of this Commitment, the terms and provisions of this Commitment shall supersede the provisions of the Letter of Intent and shall govern this transaction.

**18.** __Commitment Exhibits__:

All Exhibits and documents which are part of any Exhibit shall be provided to SFIG on a timely basis. Exhibit documents may be provided by facsimile, email, courier, postal or hand delivery. In the event any document is provided by facsimile or email to SFIG such document must also be provided in hard copy form in the highest quality available to Borrower, unless otherwise waived by SFIG. And such documents, even though may be used for underwriting purposes, shall not constitute full delivery and acceptance until hard copy of the same documents are received by SFIG either by courier, postal or hand delivery and in acceptable quality and condition. No final submission for any final funding approval or consideration for credit approval shall be submitted by SFIG until such documentation has been received in acceptable format and quality.

**19.** __Entire Agreement__:

This Conditional Commitment, the Letter of Intent, Exhibits A, B or C (and any documents referred to in them) contains the whole agreement between the Parties relating to the transactions contemplated by this Commitment and supersedes all previous understandings and agreements between the Parties relating to the Commitment. Each Party acknowledges that, in agreeing to enter into this Conditional Commitment Agreement, it has not relied on any representation, warranty, collateral contract or other assurance (except those set out in this Agreement and any documents referred to in it) made by or on behalf of any other Party or any other person whatsoever before the execution of this Agreement. Each Party waives all rights and remedies which, but for this Clause, might otherwise be available to it in respect of any such representation, warranty, collateral contract or other assurance, provided that nothing in this Clause shall limit or exclude any liability for wilful misconduct or fraud.

*Page 15 of 17*

*Initials*_____

FILED DATE: 2/8/2023 11:38 AM   2023LU01306

## 20.   **Confidentiality**:

SFIG and Borrower/Applicant (Applicant) agree not to disclose the Confidential Information at any time with any third party, entity or business not directly related to this transaction and the Subject Property other than as provided for as follows:

It is acknowledged by SFIG and the Applicant that the Confidential Information to be furnished is in all respects confidential in nature, and that any disclosure or use of the same by the either SFIG or Applicant, except as provided in the Letter of Intent (LOI) or Conditional Commitment may cause serious harm or damage to its owners and officers. Therefore, SFIG and Applicant and their officers, agents and assigns agree that both SFIG and Applicant will not use the Confidential Information furnished and mutually exchanged for any purpose other than as stated in the LOI and Conditional Commitment, and agree that the Receiving Party, SFIG or Applicant, will not either directly or indirectly by agent, employee, assigns or representative, disclose this Information, either in whole or in part, to any third party; provided, however that (a) the Information furnished may be disclosed only to those directors, officers and employees of the Receiving Party and to the Receiving Party's advisors or their representatives who need such Information for the purpose of evaluating any possible transaction (it being understood that those directors, officers, employees, advisors and representatives shall be informed by the Receiving Party of the confidential nature of such information and shall be directed by the Receiving Party to treat such Information confidentially), and (b) any disclosure of the information may be made to which Disclosing Party consents in writing.

## 21.   **Acceptance**:

This Commitment shall, at the option of SFIG, be of no force or effect unless executed and returned to SFIG, along with the Commitment Fee referenced above, on or before **FRIDAY, FEBRUARY 11TH, 2022**. Please return an original signed copy of this Commitment along with the **Commitment Fee of $150,000 U.S.D.**, referenced in Section 5, to authorize SFIG to process the Commitment under the terms hereof and commence performance of its services under the terms of this Commitment.

Completed Commitments (with Exhibits) should be sent to:

**Summit Financial and Investment Group, LLC**
10421 South Jordan Gateway – Suite 600
South Jordan, Utah 84095
Attention:     Ben Powell

*(If the Borrower is a partnership, corporation, or other legal entity other than an individual, the undersigned representative hereby warrants by his signature hereto, that he is authorized by such entity to sign on behalf thereof and to bind said entity to the terms of this Commitment and Agreement.)*

*Page 16 of 17*

*Initials*_____

FILED DATE: 2/8/2023 11:38 AM   2023LUU1306

**BORROWER:**

Virendra Patel _____

_____
*Borrower Signature*

Acceptance Date: _____

**TITLED OWNER:**

A&R Group _____
*Titled Owner*

By: _____

Title: _____

Acceptance Date: _____

*Initials_____*

Date: 3/23/2023

CIRCUIT COURT OF COOK COUNTY
LAW DIV. RM. 801,  DALEY CENTER.
 CHICAGO IL-60602


LUNA CAPITAL FUNDING, LLC


 -
wcastle@rsplaw.com

      NOTICE OF ZOOM CASE MANAGEMENT
      CASE: 2023L001306

LUNA CAPITAL FUNDING, LLC-vs-A&R DEVELOPMENT GROUP, LLC d/b/a A&R GROUP

This cause is scheduled for initial case management via Zoom
before Judge,  Donnelly, Thomas M  On Wednesday  April  26  2023 at 09:00 AM
      ** DO NOT APPEAR IN PERSON **
To access Zoom by video go to https://zoom.us/join then
enter the access code and password listed below.
ZOOM ACCESS CODE: 921 0771 7798   PASSWORD: 881878

To access Zoom by phone, call 312-626-6799 and then enter
the access code and password listed above.
For questions email: Law.Calwcc@cookcountyil.gov
You cannot access Zoom until your scheduled hearing date.
All attorneys of record and self-represented litigants are
required to appear via Zoom and advise the court as to the status of the case.